UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

THE NORTHWESTERN MUTUAL
LIFE INSURANCE COMPANY,

          Plaintiff,

    v.

RACHEL      D.      BROCKMAN,
ELIZABETH A. BROCKMAN,

          Defendants,

_____/

Case No. 2:24-CV-00186-KCD

## ORDER

Before the Court are cross-claimants Rachel D. Brockman and Elizabeth A. Brockman's motions for summary judgment. (Docs. 48, 49.)[1] Each cross-claimant has responded in opposition to the other's motion. (Docs. 52, 54.) For the reasons stated below, Rachel's motion is **DENIED**, and Elizabeth's motion is **GRANTED in part and DENIED in part**.

## I. Background

Dr. J.B. Brockman Jr. married Rachel in 2004. (Doc. 49 ¶¶ 1, 3.) Their union was brief. Four years later, the Brockmans executed a marital settlement agreement and divorced. (*Id*. ¶ 3.) According to the agreement, Dr. Brockman would pay Rachel alimony and cover certain expenses for their two

---

[1] Unless otherwise indicated, all internal quotation marks, citations, case history, and alterations have been omitted in this and later citations.

sons. (*See* Doc. 22-2.)   To ensure Dr. Brockman met those obligations, the agreement said:

> 17. Life Insurance. [Dr. Brockman] agrees to pay for and maintain a life insurance policy with a minimum face value of $1,200,000 to secure his support obligations under this Agreement. [Rachel] shall be the beneficiary. [Dr. Brockman] agrees to keep said policy in good standing for so long as the parties have a minor child.

(*Id.* at 21.) After the divorce, Dr. Brockman obtained a life insurance policy worth $1,250,000 from Northwestern Mutual Life Insurance Company. (Doc. 1 ¶ 9.) He named Rachel and their sons as the beneficiaries. (*Id.* ¶ 10.) The parties agree that the Northwestern policy was purchased to satisfy Paragraph 17.

Several years later, the Brockmans amended their marital settlement agreement. (*See* Doc. 22-3.) Under the amendment, Dr. Brockman agreed to pay child support until both of their sons were emancipated—an event that will occur no later than May 2026. (*Id.* at 3-5, Doc. 24 at 13, Doc. 49-4 at 13.) The amendment did not affect the duration of Dr. Brockman's other obligations, such as providing healthcare for the boys while they were unemancipated minors. (*See* Doc. 22-2 at 21, Doc. 22-3 at 5.)

Paragraph 17 was also amended to reflect the temporary nature of Dr. Brockman's support obligations:

> 17. Life Insurance. ***As long as [Dr. Brockman] is obligated under this Agreement to pay child support,*** [he] agrees to pay for and maintain a life insurance policy

> with a minimum face value of $1,200,000 to secure his
> support obligations under this Agreement. [Rachel] shall
> be the beneficiary. [Dr. Brockman] agrees to keep said
> policy in good standing for so long as the parties have a
> minor child.

(*See* Doc. 23-3 at 6 (emphasis added).)

Several years later, Dr. Brockman added his second wife—Elizabeth—as a beneficiary to the Northwestern policy. (*See* Doc. 1 ¶ 12.) At first, he evenly divided the policy's proceeds between her and Rachel. But as time passed—and his outstanding support obligations decreased—Dr. Brockman increased Elizabeth's share. By September 2023, Elizabeth was to receive 86% of the policy. (*Id.* ¶¶ 13-14.)

Mr. Brockman died the next month. (*Id.* ¶ 15.) Rachel and Elizabeth then made competing claims against the policy. (*Id.* ¶ 24.) Trapped between them, Northwestern paid Rachel the value of her 14% share and filed this interpleader action. Northwestern was dismissed as a party after it deposited the rest of the policy proceeds with the Court. (Doc. 33.) Rachel and Elizabeth have filed crossclaims asking the Court to declare who is entitled to the insurance proceeds. (Docs. 22, 24.)

## II. Legal Standard

This case is before the Court on diversity jurisdiction. "In diversity actions, federal courts apply state substantive law and federal procedural law." *Mace v. M&T Bank*, No. 2:20-CV-591-JLB-NPM, 2021 WL 5999302, at *3

(M.D. Fla. Dec. 20, 2021). The cross-motions before the Court raise substantive and procedural issues.

Summary judgment is, at bottom, "a procedural matter" governed by Rule 56 of the Federal Rules of Civil Procedure. *Id*. Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Bleers v. Wal-Mart Stores E., LP*, No. 2:19-CV-806-SPC-NPM, 2021 WL 2106531, at *1 (M.D. Fla. May 25, 2021). "A fact is material if it might affect the outcome of the suit under the governing law. And a material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the undisputed facts." *Pratt v. Gov't Emps. Ins. Co.,* No. 8:18-CV-1607-CEH-AEP, 2023 WL 2743264, at *5 (M.D. Fla. Mar. 31, 2023). "The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration." *Id*. "The Eleventh Circuit has explained that cross-motions for summary judgment will not, in themselves, warrant a grant of summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that

are not genuinely disputed." *Id.* "Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts." *Id.*

The cross-motions under consideration also raise substantive issues because they advance divergent interpretations of a contract: the Brockmans' marital settlement agreement. (*See* Docs. 48, 49); *Crawford v. Barker*, 64 So. 3d 1246, 1251 (Fla. 2011) ("A marital settlement agreement is a contract."). "[S]tate law governs issues of contract interpretation that arise in a diversity action." *AFC Franchising, LLC v. Purugganan*, 43 F.4th 1285, 1290 (11th Cir. 2022); *see also AXA Equitable Life Ins. Co. v. Cherry*, 496 F. App'x 917, 919 (11th Cir. 2012) ("Under Florida law, [marriage] settlement agreements are governed by contract law."). Disputes about the interpretation of a contract "are generally questions of law and, thus, properly resolved on summary judgment." *Lockheed Martin Corp. v. Galaxis USA Ltd.*, 222 F. Supp. 2d 1315, 1323 (M.D. Fla. Mar. 8, 2002); *see also Morrison v. Morrison*, 247 So. 3d 604, 608 (Fla. Dist. Ct. App. 2018) ("[N]ormally the interpretation of a marital settlement agreement is a question of law[.]").

But summary judgment is proper only if the relevant contract provisions are unambiguous. "The fact that both sides ascribe different meanings to the language does not" create ambiguity. *Kipp v. Kipp*, 844 So. 2d 691, 693 (Fla. Dist. Ct. App. 2003); *see also Seritage SRC Fin., LLC v. Town Ctr. at Boca*

*Raton Tr.*, 397 So. 3d 44, 46 (Fla. Dist. Ct. App. 2024) ("A true ambiguity does not exist merely because a contract can possibly be interpreted in more than one manner."). "A contract provision is ambiguous if it is rationally susceptible to more than one construction." *Elias v. Elias*, 152 So. 3d 749, 752 (Fla. Dist. Ct. App. 2014). "Indeed, fanciful, inconsistent, and absurd interpretations of plain language are always possible. . . . [W]here one interpretation of a contract would be absurd and another would be consistent with reason and probability, the contract should be interpreted in the rational manner." *Seritage SRC Fin., LLC*, 397 So. 3d at 46-47.

Therefore, "[w]here the terms of a contract are clear and unambiguous, the parties' intent must be gleaned from the four corners of the document." *Crawford*, 64 So. 3d at 1255. "In such a situation, the language itself is the best evidence of the parties' intent, and its plain meaning controls." *Id.*; *SCG Harbourwood, LLC v. Hanyan*, 93 So. 3d 1197, 1200 (Fla. Dist. Ct. App. 2012) ("If a contract provision is clear and unambiguous, a court may not consider extrinsic or parol evidence to change the plain meaning set forth in the contract."). When the terms of a contract are ambiguous, "the parties' intent become[s] a question of fact for the fact-finder, precluding summary judgment." *Haggin v. Allstate Invs., Inc.*, 264 So. 3d 951, 954 (Fla. Dist. Ct. App. 2019).

### III. Discussion

Rachel and Elizabeth ask the Court to interpret the Brockman's marital settlement agreement to determine who is entitled to the life insurance policy's proceeds. That is, at bottom, a legal question. *See Morrison*, 247 So. 3d at 608. The Court may thus address the dispute on summary judgment, provided the parties agree on the material facts and there isn't an ambiguity within the agreement. *Bleers*, 2021 WL 2106531, at *1; *Haggin*, 264 So. 3d at 954.

Rachel and Elizabeth agree on the material facts needed to interpret the agreement, and neither contends there is an ambiguity. (*Compare* Doc. 48, *with* Doc. 49.) In fact, Rachel argues that the marital settlement agreement and its amendment speak in "clear unambiguous language" and "control[] the disposition of the insurance proceeds." (Doc. 22 ¶¶ 28, 34.) The Court agrees. The parties may advance different interpretations of the agreement, but the relevant provisions are not "rationally susceptible to more than one construction." *Elias*, 152 So. 3d at 752. As a result, the agreement's plain meaning controls. *Crawford*, 64 So. 3d at 1255.

We start with Rachel's motion for summary judgment. Her crossclaim asks the Court to declare that she is entitled to all the policy's benefits. (Doc. 22 ¶ 39.) To support her request, she highlights a single line in paragraph 17 of the marital settlement agreement (as amended): "[Rachel] shall be the [Northwestern policy's] beneficiary." (Doc. 49 at 13-14.) According to her, this

7

language "divested" Mr. Brockman "of his ownership interest in the Policy" and gave her "an indefeasible interest in the death benefit proceeds upon execution of the Marital Settlement Agreement." (*Id*. at 16.)

But Rachel ignores the rest of paragraph 17. Just before the language she highlights is a more definite statement of the parties' intent: "As long as [Dr. Brockman] is obligated under this Agreement to pay child support, [he] agrees to pay for and maintain a life insurance policy with a minimum face value of $1,200,000 to secure his support obligations under this Agreement." (*See* Doc. 23-3 at 6.) Where "life insurance proceeds are intended as security for unpaid support obligations, only the unpaid portion [of the support obligations] may be encumbered." *Cherry*, 496 F. App'x at 920. In other words, a life insurance policy that acts as security for support obligations can be modified by the beneficiary in accordance with the remaining balance of the support commitment. That's what we have here.

The Eleventh Circuit's decision in *Equitable Life Ins. Company v. Cherry* is illustrative of the problem Rachel faces. In *Cherry,* the husband agreed to pay alimony as part of a marital settlement. 496 F. App'x at 919. His support obligations would "be secured by" two life insurance policies, for which his ex-wife would be the "sole irrevocable beneficiary." *Id*. The husband also agreed "to not encumber or decrease the face value [of the policies] so long as" he had support obligations. *Id*. Several years later—while he still owed support—the

8

husband added his second wife as a 50% beneficiary to the policy. *See id*. When he died, both women submitted claims. As here, the ex-wife sought the full policy. The district court disagreed. *See id*. Applying Florida law, it held that the ex-wife "was only entitled to the amount of alimony that [the husband] still owed to her when he died" and awarded the remaining proceeds to the second wife. *Id*.

The Eleventh Circuit affirmed on appeal. Because the life insurance policies were not distributed with the rest of the couple's assets, the court noted that accepting the ex-wife's claim to the full policy benefits would "insert a property interest into a section devoted to protection of support." *Id*. at 920. The court also stressed that "the provision in the [marital settlement agreement] requiring [the husband] to provide life insurance as security for payment of his non-modifiable alimony obligation . . . was subject to both diminution in amount and revocation ***in accordance with the remaining balance of the alimony commitment***." *Id*. (emphasis added). Thus, the court held that the ex-wife was not entitled "to more than the unpaid alimony left to be paid following [the husband's] death." *Id*.

Like the insurance policies in *Cherry*, the Northwestern policy was not distributed as part of the Brockmans' assets. (*See* Doc. 22-2 at 5-9, 20-21.) It was obtained after the divorce "to secure" Dr. Brockman's temporary child support obligations. (*Id*. at 20-21, Doc. 22-3 at 2-6.) Considering the structure

of the marital settlement agreement and the entirety of paragraph 17, the Court concludes that the insurance policy was collateral for Dr. Brockman's support obligations and not a gift or asset that belongs to Rachel.

Rachel summarily dismisses *Cherry*. (*See* Doc. 57 at 5.) Instead, she focuses on *Prudential Ins. Co. of Am. v. Reeves*, 853 F. App'x 541, 545 (11th Cir. 2021). *Reeves* is instructive, just not for the reasons she believes.

In *Reeves*, the marital settlement agreement required the husband to "maintain a life insurance policy" for which his ex-wife "[i]n order to secure [her] alimony." *Prudential Ins. Co. of Am. v. Reeves*, No. 6:18-CV-1989-ORL-41-LRH, 2020 WL 11420583, at *2 (M.D. Fla. Mar. 18, 2020). After the divorce, the husband obtained the life insurance policy as required but also named his sister as a beneficiary. *Id*. He later died, and the two women made competing claims. The district court and Eleventh Circuit held that the ex-wife was entitled to the entire policy. *Id*. at 7.

But there's a key distinction between the facts presented in *Reeves* and those before the Court today: Reeves concerned an award of "permanent periodic alimony." *Id*. at 1. Findings in the final divorce decree showed the insurance proceeds were meant to secure the ex-wife "against the risk of [the husband] dying and leaving her without a monthly $1,030.00 incoming alimony payment." *Id*. at 6. The district court, therefore, distinguished *Cherry* because it was concerned with "the unpaid portion of a finite amount of alimony

payable over ten years—not an award of permanent periodic alimony." *Id*. Thus, if *Cherry* is one side of a coin, *Reeves* is the other. Dr. Brockman's support obligations had a limit. They were not permanent. As a result, the facts here track better with *Cherry* and are unlike those presented in *Reeves*.

Rachel also cites a litany of other decisions that lack the limitations found in paragraph 17 of the Brockmans' agreement. *See Vath v. Vath*, 432 So. 2d 806, 807 (Fla. Dist. Ct. App. 1983); *Pensyl v. Moore*, 415 So. 2d 771, 772 (Fla. Dist. Ct. App. 1982); *Dixon v. Dixon*, 184 So. 2d 478, 479 (Fla. Dist. Ct. App. 1966). Nothing in those cases suggests the life insurance policies were meant to secure temporary support obligations, as here.

One more thing. Rachel claims Dr. Brockman lacked the authority to name Elizabeth as a beneficiary because the marital settlement agreement states it "shall not be modified except by written consent of the parties." (Doc. 22-2 at 5, Doc. 49 at 20.) This argument is unpersuasive because Dr. Brockman did not modify the settlement agreement. Nor was the policy property to be transferred from Dr. Brockman to Rachel during their divorce. Instead, it helped ensure Dr. Brockman would perform his support obligations. As such, Rachel was never entitled "to more than the unpaid [support] left to be paid following [Dr. Brockman's] death." *Cherry*, 496 F. App'x at 920.

The plain language of the Brockmans' marital settlement agreement does not support Rachel's claim to all proceeds of the Northwestern policy. *See*

*Crawford*, 64 So. 3d at 1255. To side with Rachel, the Court must ignore the plain language of paragraph 17 and disregard the temporary nature of Dr. Brockman's support obligations. That's unreasonable. Because Rachel has not shown that she is entitled to the declaratory relief sought, her request for summary judgment is denied. *See Bleers*, 2021 WL 2106531, at *1.

With that issue decided, we turn to Elizabeth's motion for summary judgment. First, she asks the Court to declare that Rachel is only entitled to "the amount of the future unpaid support obligations" owed "as of October 20, 2023," thus leaving her whatever remains. (*See* Doc. 24 at 18.) The Court addressed these issues above. In responding to Elizabeth's motion, Rachel largely recycles the same arguments and case law. (*Compare* Doc. 49, *with* Doc. 52.)

Rachel tries to buttress her recycled arguments with reference to district court decisions like *Lincoln Nat'l Life Ins. Co. v. Brophy*, No. 8:09-CV-778-AEP, 2009 WL 10670858 (M.D. Fla. Nov. 23, 2009) and *Primerica Life Ins. Co. v. Moore*, No. 8:07-CV-1687-TTGW, 2008 WL 1886032 (M.D. Fla. Apr. 28, 2008) (Doc. 52 at 8-11.) But they predate the Eleventh Circuit's decision in *Cherry*. So, in effect, Rachel asks the Court to ignore more recent precedent. The Court declines the invitation. Nothing in Rachel's response changes the result reached above. Given the language in paragraph 17, Dr. Brockman was entitled to change the beneficiary designation for the Northwestern policy. And

12

Rachel is entitled to no more than the sum of Dr. Brockman's outstanding support obligations when he passed. *See Cherry*, 496 F. App'x at 920. It naturally follows that Elizabeth—as the only other beneficiary—is entitled to whatever is left. *Id.*; (*see also* Doc. 1 ¶ 14). Elizabeth is, therefore, entitled to summary judgment on Rachel's crossclaim. She is also entitled to summary judgment on her request that the Court declare Rachel is only entitled to "the amount of the future unpaid support obligations" owed "as of October 20, 2023." (Doc. 24 at 18, Doc. 48 at 25.)

That leaves the rest of Elizabeth's request for injunctive relief—resolve what "future unpaid support obligations" Dr. Brockman still owed Rachel at the time of his death, determine whether Rachel has received any excess payments, and, if so, order Rachel to disgorge herself of the excess funds. (*See* Doc. 24 at 18.) Rachel largely ignored these claims when responding to Elizabeth's motion. Instead, she asserts that should the Court "reach the issue of calculating Dr. Brockman's unpaid support obligations, the arguments submitted by Elizabeth A. Brockman are disputed, and this Court would be required to hold an evidentiary hearing on determining the amount." (Doc. 52 at 14.)

The Court agrees it cannot resolve these remaining questions as a matter of law. While it is undisputed that Dr. Brockman still had support obligations at his death, the extent of those obligations is contested. For instance, the

parties dispute whether Dr. Brockman was responsible for several medical bills related to his son's cancer treatments. Elizabeth claims they were not correctly submitted, but there is contrary evidence on this point. (*Compare* Doc. 48 at 12, *with* Doc. 49-14 at 6.) And while Elizabeth focuses on Dr. Brockman's child support obligations, paragraph 17 covers more. An evidentiary hearing is needed to determine the extent of Dr. Brockman's full support obligations and whether Rachel received excess payment from Northwestern.

Accordingly, it is now **ORDERED**:

1.  Rachel Brockman's Motion for Summary Judgment (Doc. 49) is **DENIED**.

2.  Elizabeth Brockman's Motion for Summary Judgment (Doc. 48) is **GRANTED** in part. The Court **GRANTS** Elizabeth's request for summary judgment on Rachel Brockman's crossclaim (Doc. 22) and further declares: (1) Dr. Brockman owned Northwestern life insurance policy 19191688, (2) under the terms of the Brockmans' marital settlement agreement, the policy was meant "to secure" his support obligations, (3) thus Rachel Brockman is not entitled to the windfall that would result from awarding her all of the policy's proceeds, but is only entitled to receive an amount equal to the sum of Dr. Brockman's outstanding support obligations when he passed, and (4) Elizabeth is entitled to the remaining proceeds

14

after Dr. Brockman's support obligations have been satisfied. Elizabeth's motion is **DENIED** as to the remaining relief, which the Court will decide after hearing further evidence to resolve outstanding factual disputes.

**ENTERED** in Fort Myers, Florida on March 4, 2025.

Kyle C. Dudek
United States Magistrate Judge